[Cite as *State v. Capp*, 2016-Ohio-295.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102919**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DAVID CAPP

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED; REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-583833-A

**BEFORE:** E.A. Gallagher, P.J., Boyle, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** January 28, 2016

**ATTORNEY FOR APPELLANT**

Michael P. Maloney
24441 Detroit Road, Suite 300
Westlake, Ohio 44145


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Erin Stone
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN A. GALLAGHER, P.J.:

{¶1} Defendant-appellant David Capp appeals his convictions on three three-year firearm specifications under R.C. 2929.14(B)(1) and 2941.145(A). Capp contends that there was insufficient evidence to support his convictions on the firearm specifications and that the trial court erred in denying his Crim.R. 29 motion for acquittal as to these specifications. For the reasons that follow, we affirm Capp's convictions; however, we remand the case so that the trial court may address the firearm specifications associated with Count 3 as to which Capp has not been sentenced.

**Factual and Procedural Background**

{¶2} On April 8, 2014, Capp was indicted by a Cuyahoga County Grand Jury on four counts in connection with the March 18, 2014 shooting of John Marshall: two counts of felonious assault in violation of R.C. 2903.11(A)(1) (Counts 1 and 2), one count of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) (Count 3) and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2) (Count 4). Counts 1, 2 and 3 also carried one-year and three-year firearm specifications under R.C. 2941.141(A) and 2941.145(A), respectively. Capp pled not guilty. He waived his right to a jury trial on the having weapons while under disability count. The remaining counts were tried before a jury. A summary of the evidence presented at trial relevant to the issues in this appeal follows.

{¶3} During the afternoon of March 18, 2014, Jennifer Hayne was at work when she received a call from her next-door neighbor advising her that Capp, an ex-boyfriend,

was at her residence and wanted to talk with her. She testified that she had known Capp since she was 12 and had dated him three different times in the past 13 years. Hayne acknowledged that there was "bad blood" between them and testified that, approximately three weeks earlier, Capp had shattered her windshield and she had changed her cell phone number to avoid contact with him. She stated that she believed Capp was angry with her because she had stopped talking to him.

{¶4} When Hayne finished her shift 15 or 20 minutes later, she drove home. Capp was not there. Hayne testified that although she had no desire to talk to Capp, she called his cell phone to find out why he wanted to talk with her. According to Hayne, Capp was "very irate" and "disrespectful" and told her that he was coming to her house to beat up her current boyfriend, James Marshall.

{¶5} Hayne and Marshall had dated "on and off" for 13 years and have a 12-year-old daughter together. According to Hayne, they had recently begun dating again and, as of March 18, 2014, had been back together for approximately three to four weeks. Immediately prior to their reconciliation, Hayne had been seeing Capp in a "friends with benefits kind of thing." Hayne testified that she hid this from Marshall because she knew he would be "very sad."

{¶6} Approximately ten minutes after Hayne spoke with Capp, he arrived at Hayne's house in a red S-10 pickup truck. The truck was driven by Troy Winters, an acquaintance of Hayne's, whom she had known since 2007 as "T.J.," and Capp was in the passenger's seat. Hayne testified that after Capp and Winters exited the vehicle, Capp

walked to the driver's side of the vehicle, lifted up his shirt, took something from his pants and placed it inside the vehicle. Winters began pacing back and forth, asking Hayne, "Where's your boyfriend at? When's he coming? When's he gonna get here? We got something for him." Hayne testified that Capp said "[t]he same thing," "[s]creaming, yelling, cussing, [and] being very irate." Hayne then called Marshall. She testified that she told Marshall that Capp and Winters were outside the house being "very irate" and "threatening to fight him" and that he needed to get home. After Hayne spoke with Marshall, she told the two men that Marshall was on his way home. Capp and Winters waited 15 minutes then left in the red pickup truck. When they left, Winters was driving and Capp was in the passenger's seat.

{¶7} Marshall testified that he was attending an intensive outpatient alcohol treatment program when he received several calls from Hayne. He received the first call at approximately 3:30 p.m. When he answered his cell phone, Hayne told Marshall that she was at home and that Capp was there, screaming, yelling and threatening her. Marshall testified that while he was on the phone with Hayne, he heard Capp screaming and yelling in the background, "F* * * you, b* * **. Tell him to come on. I'm about to f* * * you all up. Today's the day." Marshall testified that he was worried for Hayne and told his counselor he had to leave treatment early due to an emergency. Marshall's father, Walter Marshall ("Walter"), who had been waiting outside to drive Marshall home after treatment, then drove Marshall to his home on West 56th Street in Cleveland, where Marshall was living with Hayne.

{¶8} Marshall arrived home at approximately 4:00 p.m. A group of seven to ten neighbors were standing with Hayne in or near the street in front of Marshall's house. Marshall began speaking with Hayne and their next-door neighbor, attempting to figure out what was going on, when he saw a red S-10 pickup truck drive up the street. Hayne pointed the truck out to Marshall and said, "There they are right there." The pickup truck stopped on the opposite side of the street, several houses down from Marshall's house. Marshall saw a driver and passenger in the pickup truck. He did not know the identities of the driver or passenger at the time but later learned that the driver was Winters and the passenger was John Jones.

{¶9} Marshall testified that he walked toward the truck, intending to try to talk to the two men. When he was three to four feet from the truck, the driver's-side door opened. The passenger, Jones, handed the driver, Winters, a .22 revolver gun and said, "Shoot this b * * * *." Marshall testified that his attention was focused on the gun. Marshall then heard Capp say, "Kill that mother f * * * * *." Marshall had not realized Capp was there but after he heard his voice, Marshall looked up and saw Capp standing in the back of the pickup truck.

{¶10} Hayne was standing outside in her front yard when Marshall approached the pickup truck. She testified that seconds after the truck stopped, Capp popped up from the bed of the truck and she heard him say, "T, we're going to spray this b * * * * up and dip." The car door opened, and gunshots started going off. Haynes testified that she never saw a gun but heard three or four shots.

{¶11} Marshall testified that within seconds after Capp spoke, Winters fired the gun and hit the ground near Marshall's feet. Winters raised the gun and fired three more shots, shooting Marshall twice in the left thigh and once in the right thigh. Marshall fell to the ground. Walter and Hayne came over to help Marshall as the pickup "peeled off and left" heading south toward Denison.

{¶12} Walter was standing near his van in Marshall's driveway when the incident occurred. Walter testified that as Marshall was walking down the street toward the red pickup truck, the driver's side door opened, "a couple words [were] said" (but he could not make them out), and he saw the driver of the pickup shoot his son. Walter testified that he heard four shots. Marshall was laying on the ground screaming, and Walter ran over to him. As he leaned over Marshall, Walter saw Capp standing in the back of the pickup truck. Walter had not seen Capp before the shots were fired. Walter testified that Capp "said some words" and then said, "Take that, b * * * * * *," and drove off.

{¶13} Marshall limped to Walter's minivan, and Walter drove him to the hospital where Marshall was treated for the three gunshot wounds to his thighs and then released.

{¶14} On March 20, 2014, two days after the incident, Hayne received a call from Capp asking her to pick him up and drive him out of Cleveland. Hayne agreed to come get him and then contacted Sergeant Thomas Shoulders, a sergeant in Cleveland's second district detective bureau, who had been assigned to investigate the incident. Hayne and Sergeant Shoulders decided to "go and set David Capp up." On her way to pick up Capp, Hayne stopped at the second district police station and picked up Sergeant

Shoulders. Sergeant Shoulders hid under a coat or blanket in the back seat of Hayne's vehicle as she drove to meet Capp. A number of unmarked police cars followed them. As Hayne drove out to meet him, Capp called Hayne and changed their meeting place several times. Hayne testified that during one of their telephone conversations, Capp told Hayne that "if he had the strength to pull the trigger himself he would have." Hayne ultimately met Capp in the back of the Marc's parking lot on West 150th Street in Cleveland. Hayne testified that Capp told her to move to the passenger's side of the vehicle and that as Capp slid into the driver's seat, Sergeant Shoulders put a gun to the back of his head and told Capp to put his hands up. Capp complied and was apprehended.

{¶15} At the close of the state's case, Capp moved for acquittal on all counts, including the firearm specifications, pursuant to Crim.R. 29(A). The trial court denied the motion. Capp presented no witnesses in his defense. He renewed his Crim.R. 29(A) motion, and, once again, the trial court denied the motion.

{¶16} The jury found Capp guilty on Counts 1-3, including all of the one-year and three-year firearm specifications. The trial court found Capp guilty on Count 4. The trial court merged Count 2 into Count 1 for sentencing and sentenced Capp to 11 years in prison on Count 1 (8 years on the base charge and three years on the firearm specification) and to three years in prison on each of Counts 3 and 4, to be served concurrently to each other and concurrently to the sentence imposed on Count 1. The trial court also imposed three years of mandatory postrelease control. The trial court did

not address the firearm specifications in Count 3 at the sentencing hearing or in its sentencing journal entry. This appeal followed.

{¶17} Capp raises the following single assignment of error for review:

> The trial court erred in denying appellant's Criminal Rule 29 motion for acquittal when there was insufficient evidence to prove the three-year firearm specification under [R.C.] 2929.14(B)(1) and 2941.145.

**Law and Analysis**

**Sufficiency of the Evidence Supporting Convictions on the Three-Year Firearm Specifications Under R.C. 2929.14(B)(1) and 2941.145(A)**

{¶18} In his sole assignment of error, Capp challenges the sufficiency of the evidence as it relates to his convictions on the three-year firearm specifications in Counts 1, 2 and 3.[1] Capp contends the trial court erred in denying his Crim.R. 29 motion for acquittal on the three-year firearm specifications because the state failed to present sufficient evidence establishing (1) that he possessed or used a firearm or (2) his complicity as to the firearm specifications.

{¶19} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315,

---

[1]Capp does not challenge his convictions on the one-year firearm specifications or the base offenses. Nor does he challenge his conviction for having weapons while under disability.

2014-Ohio-3134, ¶ 21. Accordingly, we review a trial court's denial of a defendant's motion for acquittal using the same standard we apply when reviewing a sufficiency-of-the-evidence claim. *Id.* at ¶ 21-23 ("Crim.R. 29(A) and sufficiency of evidence review require the same analysis."), citing *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571.

{¶20} When reviewing the sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When performing a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Jenks* at paragraph two of the syllabus.

{¶21} In Counts 1, 2 and 3, in addition to his convictions on the base offenses, Capp was convicted of three three-year firearm specifications under R.C. 2941.145(A). As to each of the three-year firearm specifications, the state was required to prove beyond a reasonable doubt that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A); R.C. 2929.14(B)(1).

{¶22} The state concedes that there was no evidence that Capp himself possessed or used a firearm in connection with the shooting incident and did not argue that he was

the principal offender at trial. Instead, the state proceeded on the theory that Capp was complicit with Winters and Jones in the commission of the offenses as an "aider or abettor."

**{¶23}** Under Ohio's complicity statute, R.C. 2923.03, "[n]o person acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense; * * * ." R.C. 2923.03(A)(2). "A charge of complicity may be stated * * * in terms of the principal offense." R.C. 2923.03(F). A person who is guilty of complicity in the commission of an offense "shall be prosecuted and punished as if he were a principal offender." *Id.*

**{¶24}** The complicity statute requires that an accomplice be treated as though he was the person who committed every act of the underlying principal offense. *State v. Kimble*, 7th Dist. Mahoning No. 06 MA 190, 2008-Ohio-1539, ¶ 27. "'In other words, the court can impute the elements of the principal offense, committed by the principal, to the aider and abettor.'" *Id.*, quoting *State v. Jackson*, 90 Ohio App.3d 702, 705, 630 N.E.2d 414 (6th Dist.1993); *State v. Hurse,* 10th Dist. Franklin No. 14AP-687, 2015-Ohio-2656, ¶ 11.

**{¶25}** To support a conviction based upon a defendant's complicity by "aiding and abetting" another in committing an offense under R.C. 2923.03(A)(2), "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796

(2001), syllabus. As this court explained in *State v. Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459:

> "In order to constitute aiding and abetting, the accused must have taken some role in causing the commission of the offense. *State v. Sims*, 10 Ohio App.3d 56, 460 N.E.2d 672 (1983). 'The mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). * * * A person aids or abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. *State v. Johnson*, 93 Ohio St.3d 240, 245-246, 754 N.E.2d 796. 'Such intent may be inferred from the circumstances surrounding the crime.' *Id.* at 246, 754 N.E.2d 796."

*Id.* at ¶ 23, quoting *State v. Langford*, 8th Dist. Cuyahoga No. 83301, 2004-Ohio-3733, ¶ 20-21. Aiding and abetting may be shown by direct or circumstantial evidence, and a defendant's participation may be inferred from the defendant's presence, companionship and conduct before and after the offense is committed. *Howard* at ¶ 23, citing *Langford* at ¶ 21, citing *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981). A defendant may "aid" or "abet" another in the commission of an offense by his words, gestures, deeds or actions.

{¶26} Capp argues that since he was not in the cab of the pickup truck with the two men who handled the gun, did not hand either of them a weapon at the time of the shooting and had no weapon himself of any kind, the trial court should have granted his Crim.R. 29 motion on the three-year firearm specifications because the state failed to prove that he "specifically aided or abetted Troy Winters in brandishing, possessing or using the firearm at the time of the shooting incident" and that, therefore, there was

insufficient evidence for the jury to convict him of the three-year firearm specifications. We disagree.

{¶27} If complicity is proven, a defendant is subject to a sentencing enhancement on a firearm specification regardless of whether he was the principal offender or an unarmed accomplice. *State v. Chapman*, 21 Ohio St.3d 41, 42-43, 487 N.E.2d 566 (1986); *Howard* at ¶ 24 ("It is well settled that an unarmed accomplice can be convicted of an underlying felony, together with a firearm specification, based on an aider and abettor status."), quoting *State v. Porch*, 8th Dist. Cuyahoga No. 65348, 1994 Ohio App. LEXIS 1936, *11 (May 5, 1994). "In such a case, the actions of the principal are imputed to the accomplice, and the accomplice may be found to have committed every element of the offense committed by the principal, including possession of the weapon." *State v. Humphries*, 8th Dist. Cuyahoga No. 99924, 2014-Ohio-1230, ¶ 18, citing *State v. Frost*, 164 Ohio App.3d 61, 2005-Ohio-5510, 841 N.E.2d 336 (2d Dist.), and *State v. Alexander*, 8th Dist. Cuyahoga No. 98941, 2013-Ohio-2533; *State v. Noor*, 10th Dist. Franklin No. 13AP-165, 2014-Ohio-3397, ¶ 51, fn. 2 ("A firearm specification is not a separate offense but, rather, a sentencing provision that enhances the penalty for the associated predicate offense.").

{¶28} In *Howard,* for example, this court upheld a defendant's convictions for felonious assault, improper discharge of a weapon into a habitation, having a weapon while under disability and the accompanying one-, three- and five-year firearm specifications based on a finding of complicity under R.C. 2923.03(A)(2) even though the

defendant himself never possessed a gun. *Howard,* 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459*,* at ¶ 2, 25. The victim was the father of the defendant's ex-girlfriend, Madelyn Jenkins. *Id.* at ¶ 4, 6. The defendant, Andre Howard, Jr., and Jenkins, who had recently broken up, had an argument, and Jenkins went over to her father's house. *Id.* at ¶ 3-5, 20. Howard drove by her father's house three times with three other people in the vehicle. *Id.* at ¶ 5. During one of those trips, he stopped the car at a stop sign and yelled, "I'm coming right back." *Id.* When Howard drove past the house a fourth time, one other person was in the vehicle with him, and two bikes followed the vehicle as it drove down the street. *Id.* As the vehicle slowly approached the house, shots were fired by the men on the bikes and the passenger in Howard's vehicle. *Id.* at ¶ 5, 7. The victim was hit in the head by a bullet. *Id.* at ¶ 6. The next day Howard drove by the house again and made a "gun-like gesture." *Id.* at ¶ 19. Although there was no claim Howard was one of the shooters, the court found that he was the driver of the vehicle involved in the shooter and the "instigator" of the shooting. *Id.* at ¶ 21. The court found that Howard's conduct before and after the offenses as well as his role as the driver of the vehicle was sufficient to support the trial court's finding that Howard "acted in complicity with the men carrying the weapons." *Id.* at ¶ 25. As such, he was subject to the "'same prosecution and punishment, including sentencing enhancements'" as the principal offenders. *Id.* at ¶ 24, quoting *State v. Fulton*, 8th Dist. Cuyahoga No. 96156, 2011-Ohio-4259, ¶ 42. A similar conclusion is warranted in this case.

{¶29} Capp does not contend that any of the elements of the underlying offenses of felonious assault in violation of R.C. 2903.11(A)(1) or illegal discharge of a firearm in violation of 2923.162(A)(3) were not met and does not claim that the state otherwise failed to present sufficient evidence to support his convictions on those charges under a complicity theory. Capp likewise does not dispute that the state presented sufficient evidence to prove that Winters had a firearm "on or about [his] person or under [his] control while committing the offense" and that he "display[ed] the firearm, brandish[ed] the firearm, indicat[ed] that [he] possessed the firearm, or us[ed] it to facilitate the offense[s]" at issue. Capp challenges only his convictions on the three-year firearm specifications in Counts 1, 2 and 3, claiming that there was insufficient evidence of his complicity as to these firearm specifications. Contrary to Capp's argument, however, once the state proved that Capp was complicit in the commission of the underlying offenses, the state did not then also need to separately prove Capp's complicity as to the associated firearm specifications, i.e., that Capp "specifically aided and abetted Troy Winters in brandishing, possessing or using the firearm at the time of the shooting incident." *State v. Moore*, 2013-Ohio-1435, 990 N.E.2d 625, ¶ 60 (7th Dist.). ("an unarmed person can be sentenced for a firearm specification if they were only complicit in committing the offense to which the specification attached"), citing *Chapman*, 21 Ohio St.3d at 42, 487 N.E.2d 566; *see also Noor*, 10th Dist. Franklin No. 13-AP-165, 2014-Ohio-3397, at ¶ 51, fn. 2 (Because a firearm specification is not a separate offense

and does not stand alone, it "does not carry a mens rea separate from commission of the predicate offense.").

{¶30} To support a conviction for a firearm specification, the jury must find that the defendant or an accomplice had a firearm on or about his person or under his control while committing the offense and displayed, brandished, or indicated possession of the firearm or used it to facilitate the offense. *See State v. Mincy*, 1st Dist. Hamilton No. C-060041, 2007-Ohio-1316, ¶ 49-51; *State v. Johnson*, 8th Dist. Cuyahoga No. 99656, 2013-Ohio-5430, ¶ 25 (defendant was properly convicted of two firearm specifications under R.C. 2941.145, where, although there was no evidence that defendant held the firearm, he nevertheless had control over it pursuant to the complicity statute because there was credible evidence that his accomplice used a firearm to commit the robbery); *State v. Salyer*, 12th Dist. Warren No. CA2006-03-039, 2007-Ohio-1659, ¶ 30 ("A defendant may be convicted of an offense, which includes a firearm specification, where his co-defendant or uncharged accomplice utilized a firearm in the commission of the offense and the defendant, himself, is found to have acted as an accomplice."). Once it was established that Capp aided and abetted Winters in committing the underlying offenses and that Winters used the firearm to facilitate the offenses at issue, Winters' use of the firearm was properly imputed to Capp and Capp was subject to the same punishment, including the sentencing enhancements resulting from the firearm specifications, as the principal offender, Winters.

{¶31} Viewing the evidence in the light most favorable to the state, Capp's participation in the crimes at issue and shared criminal intent can be reasonably inferred from his conduct and statements both before and after the shooting. This is not a case in which a defendant was merely present at the scene of an incident involving others. The evidence demonstrates that Capp assumed an active role in the commission of the offenses and in causing the shooting to occur. The state presented ample evidence establishing that it was Capp's relationship with Hayne and his anger or jealously following Hayne's reconciliation with Marshall that led to the shooting. It was Capp who had the connection to Hayne and Marshall — not Winters or Jones. The record establishes that on the day of the shooting, Capp showed up at Hayne's house twice before the shooting, looking for Hayne and threatening to "beat up" Marshall. Hayne testified that the second time Capp showed up at her home, he and Winters asked Hayne where Marshall was and when he was going to return because they had "something for him." Marshall testified that when Hayne called him during his outpatient treatment, he heard Capp screaming and yelling in the background, "F * * * you, b * * * *. Tell him to come on. I'm about to f * * * you all up. Today's the day."

{¶32} There was also evidence from which the jury could have reasonably concluded that Capp directed the actions of Winters in shooting Marshall. When Capp returned to Hayne's house a third time, he was hiding in the back of the pickup truck. Hayne testified that after the pickup truck stopped, Capp popped up from the bed of the pickup truck and said, "T" — which the jury could reasonably infer was directed to Troy

Winters a.k.a. "T.J." — "we're going to spray this b * * * * up and dip." Marshall testified that within seconds after Jones handed the gun to Winters, Capp stood up in the back of the pickup truck and called out, "Kill that mother f * * * * *." Winters then began shooting Marshall. This evidence, if believed, was sufficient to support a finding that Capp "encourage[d]," "advise[d]" and/or or "incite[d]" Winters in the commission of the offenses at issue and "share[d] [his] criminal intent" to harm Marshall by shooting him with the firearm. *See, e.g., In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 1, 13-14, 17 (sufficient evidence existed to support a finding of complicity where defendant was part of a gang who had been passing around a gun and defendant was heard to shout "shoot" and "shoot the [expletive]" immediately before shots were fired by an unidentified member of the gang); *State v. Hughes,* 9th Dist. Summit No. 27061, 2014-Ohio-4039, ¶ 25-29 (there was sufficient evidence that defendant "supported, assisted, * * * [or] cooperated with" assailants when she led the men into the victim's apartment, smiled at them, stood by and watched as they assaulted and robbed the victim, showed no fear or concern for him during the attack, left the apartment at the same time as the assailants, never called the police, never called to check on the victim and knew at least one of the assailants to support finding that defendant aided and abetted robbery).

{¶33} Capp's conduct following the shooting further supports the jury's finding that he acted in complicity with Jones and Winters. Walter testified that after the shots were fired he heard Capp say, "Take that, b* * * * * *" as the pickup drove off. Hayne

testified that after the shooting Capp told her that "if he had the strength to pull the trigger himself he would have."

**{¶34}** Following a thorough review of the record, we find that there is sufficient evidence to support a finding, beyond a reasonable doubt, that the shooting was a joint and concerted effort and that Capp acted in complicity with Winters and Jones in committing the offenses at issue. Based on his status as an aider and abetter, Capp was properly convicted of both the underlying offenses for felonious assault and illegal discharge of a firearm and the associated three-year firearm specifications in Counts 1, 2 and 3.

**{¶35}** Capp's assignment of error is overruled.

**Failure to Address Specification in Sentencing Journal Entry**

**{¶36}** Although not identified as a separate assignment of error, as Capp points out in his brief, the trial court failed to address the firearm specifications in Count 3 at the sentencing hearing or in its sentencing journal entry. This error does not render the trial court's judgment nonfinal. *State ex rel. Jones v. Ansted*, 131 Ohio St.3d 125, 2012-Ohio-109, 961 N.E.2d 192 (journal entry was a final appealable order despite not disposing of every firearm specification of which defendant was found guilty). However, we remand the case so that the trial court may address the firearm specifications of which Capp was convicted in Count 3.

**{¶37}** Judgment affirmed; remanded to address sentencing on the firearm specifications in Count 3.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for correction of the journal entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
FRANK D. CELEBREZZE, JR., J., CONCUR