[Cite as *State v. Allen*, 2023-Ohio-714.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

                              No. 111538

    v.                           :

CALVIN ALLEN,                            :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 9, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-662461-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Poula E. Hanna, Assistant Prosecuting Attorney, *for appellee.*

L. Bryan Carr, *for appellant.*

ANITA LASTER MAYS, A.J.:

{¶ 1} Defendant-appellant Calvin Allen ("Allen") appeals his conviction and sentence for felonious assault. For the reasons set forth below, we affirm the trial court's judgment.

## I.  Procedural and Factual History

{¶ 2}  On August 24, 2021, Allen was charged with two counts of felonious assault under R.C. 2903.11(A)(1) and 2903.11(A)(2), second-degree felonies.  Allen pleaded not guilty, and the jury trial commenced on March 23, 2022.  On March 25, 2022, Allen was convicted of both counts.  On April 25, 2022, Allen was sentenced on Count 1 of the allied offenses to a three-year prison term.  The following facts presented at trial gave rise to the convictions.

{¶ 3}  Detective Michael Hale ("Det. Hale") of the Cleveland Police Department ("CPD") testified that he responded to a crime-scene on War Avenue in Cleveland, Ohio, on August 15, 2021, at approximately 9:00 a.m.  The detective took photos of the scene and placed evidence markers.  (Tr. 184.)

{¶ 4}  Photographs depicted a yellow handled hammer laying at the left driveway apron at the curb, and a purple towel heavily stained with blood laying in a large blood stain at the left side of the driveway just before the sidewalk area.  The stone base of the front right corner of the house was crumbled with a large hole, and the siding area above it damaged from an impact.  The grassy area below the damage contained blood.  A bloodied headlight unit and bumper portion were located on the right side of the driveway across from the damaged area of the house.  It is unknown whether those items landed in that area or were possibly moved by EMS or police.

{¶ 5}  The victim and suspect were not at the scene.  Det. Hale did not speak with bystanders or search for witnesses.  The detective clarified that his role as the

crime-scene detective was to depict the crime-scene as accurately as possible and to preserve the evidence.

{¶ 6} Victim Tamieyah McCord ("McCord") testified next. McCord had been dating Julie Leonetti ("Leonetti") for almost two years. Leonetti was in the process of divorcing Allen with whom Leonetti had three children. McCord moved into the War Avenue residence with Leonetti and the children about a year prior to the incident. McCord stated Allen arrived at the residence about 8:00 a.m. that morning, though on cross-examination and based on McCord's 911 call, the time was established to be closer to 9:00 a.m.

{¶ 7} McCord testified that Allen's visitation with the children was limited pursuant to the divorce papers, that Allen was not entitled to visitation the day of the incident, and that Leonetti was seeking a protection order against Allen. McCord usually accompanied Leonetti to meet Allen to exchange the children for visitation purposes. Allen would usually make derogatory comments to McCord about her lifestyle.

{¶ 8} Allen began "banging on the door" and screaming for the children "to come to the window." (Tr. 209-210.) McCord stated she opened the door and told Allen he was not supposed to be there at that time for the children. McCord said Leonetti was standing on the porch screaming. McCord called 911 and the recording was played for the jury.

{¶ 9} This court reviewed the 911 call that began at 9:09 a.m. McCord could be heard calmly telling the 911 dispatcher the address of the residence and the

children to stay in the bedroom. A male voice identified by McCord as Allen could be heard yelling in the background as McCord speaks with the dispatcher. McCord told the dispatcher that Allen was banging on the door and was not supposed to be there. At one point Allen was heard loudly saying that he wanted to see his children. McCord told the dispatcher that Allen had pulled into the driveway in a Chevy Blazer and blocked their car, and she provided the plate number.

{¶ 10} At that point, multiple voices began yelling and sounds that McCord identified during testimony as a scuffle could be heard. Subsequently, someone yelled "Oh my God." Loud screams, crying, and additional unintelligible words were heard. Six minutes and 25 seconds into the call, the dispatcher said another call had just been received regarding the altercation and the first call was ended.

{¶ 11} McCord testified that Allen hit her in the face and the two "were tussling and that is when you probably heard the phone drop" during the 911 call. (Tr. 214.) McCord continued, "three minutes after he hit me, it kind of triggered me so I went back in the house and I grabbed a hammer." (Tr. 215.) Allen was backing a Chevy Tahoe out of the driveway into the street when McCord threw the hammer, which she stated did not hit Allen or the truck. McCord went back into the house.

{¶ 12} McCord assumed that Allen was gone and returned outside to retrieve the hammer, but Allen had not departed. (Tr. 221-222.) McCord said that Allen "locked eyes with me" "[a]nd he basically put his car in drive and pinned me between the house and his car." (Tr. 222.)

{¶ 13} McCord stated that when she was pinned against the house, Leonetti "came out screaming and I remember him dragging me down the driveway a little bit and I was not released off his vehicle until she pulled me out of his grill." (Tr. 222.) McCord was transported to the hospital by ambulance and suffered serious damage to her left leg, a broken tailbone, and loss of movement in her foot. McCord used a walker, has had several surgeries, and will require more. McCord, Leonetti, and the children left the house on War Avenue and stayed in hotels reportedly due to fear of Allen. The injuries seriously impacted McCord's quality of life and ultimately contributed to conflict that ended the relationship with Leonetti. The two were no longer on speaking terms by the time of trial.

{¶ 14} Leonetti and one of the children pulled McCord back into the house during McCord's brief scuffle with Allen. McCord clarified that the crime-scene photograph of the hammer's location at the end of the driveway is not where the hammer landed when McCord originally threw it at Allen's vehicle. The photograph showed the hammer's location after McCord was hit by Allen's vehicle.

{¶ 15} CPD officer John Hannwald ("Officer Hannwald") and his partner were dispatched to East 131st Street in Cleveland where the suspect reportedly worked at a body shop to look for the damaged Chevy Blazer and suspect Allen. The officers observed a Blazer with front end damage and a male riding a bicycle nearby. They called Allen's name, and the individual who was indeed Allen pedaled away more quickly. The officers secured Allen after a foot chase. Allen was *Mirandized* and transported to War Avenue in the zone car where he was further interviewed.

Allen told the officers that McCord hit him in the face, which caused the small amount of blood observed on Allen's upper lip. The officers took Allen to St. Vincent Charity Hospital and next to the county jail.

{¶ 16} CPD officer James Kertcher ("Officer Kertcher") and his partner responded to a 911 call that originally was "just an open line, 911 call with a lot of commotion in the background. Our radio dispatch did not really have a lot of information to give us as it was just sort of screaming into the phone." (Tr. 289-290.) Officer Kertcher described it as a "pretty typical call, a sound 911 or an open 911 line. Essentially we have to just figure it out when we get there." (Tr. 290.)

{¶ 17} The officers arrived on War Avenue to see McCord sitting on the ground where the driveway met the sidewalk in a "significant pool of blood surrounding her entire body." (Tr. 291.) EMS was summoned. Leonetti was "crying, screaming" and trying to assist McCord who had a "massive laceration on her leg" and was shrieking in agony. (Tr. 292.)

{¶ 18} Leonetti told police that her ex-husband, Allen, arrived at the house unannounced, "banging on the door." "An altercation ensued within the doorway between [McCord] and [Allen] and next thing you know [McCord] was being pinned against the side of the house with [Allen's] vehicle," a gold Chevy Blazer. (Tr. 294.) "[T]he vehicle fled eastbound on War towards East 71st and [Leonetti] mentioned that he * * * works at an auto body shop on East 131st and Union." (Tr. 294.)

{¶ 19} Officer Kertcher broadcasted the information to fellow officers and subsequently interviewed Allen when he was brought to the scene. Allen told

officers that he had a physical altercation with McCord, "both parties were struck," McCord picked up a hammer and stood in front of Allen's vehicle, and Allen left the scene. (Tr. 295.) Allen stated, "he panicked when she threw the hammer at the car" and "threw the vehicle in drive and then struck her before fleeing." (Tr. 300.) Allen provided varying explanations of the vehicle's location during the altercation.

{¶ 20} During cross-examination, Officer Kertcher confirmed that Leonetti said that McCord was upset when she answered the door and told Allen he was not welcome, called 911 and continued outside to further confront him. Leonetti also said that Allen punched McCord in the face and Leonetti went outside and brought McCord back inside. The officer also confirmed that Allen told him that McCord threw a small bottle of wine in his face and punched him in the lip when she exited the home. Officer Kertcher estimated the distance from the point where McCord was hit to the point where she was found to be "more than five feet." (Tr. 311.) The second call to 911 referenced in the McCord recording was from Leonetti.

{¶ 21} The state rested. Allen moved for judgment of acquittal under Crim.R. 29 on the ground that there was no evidence that Allen acted knowingly. The motion was denied.

{¶ 22} Allen testified in his defense and said he had visitation rights on alternating weeks and weekends, there had been no previous issues seeing the children, and the temporary restraining order that was issued after the incident had been terminated. Allen stated that on the day of the incident, he parked the car, knocked on the door, and "introduced myself, Calvin. I am here to pick up the kids."

(Tr. 330.) Allen stated McCord "shot straight out the door, angry" and began swearing at him to "get the f**k out of here." (Tr. 330.) Allen said he tried to look past McCord to see where the kids were at when McCord poured wine in his face and punched him in the mouth.[1]

{¶ 23} Allen stated he walked off after McCord hit him and no scuffle occurred. Allen was sitting in the Blazer examining his lip in the mirror when he looked up and saw McCord running toward him on the driver's side of the SUV holding a hammer. Allen "jumped and put the car in reverse but it was in drive." (Tr. 332-333.) "I was scared for my life." (Tr. 333.)

{¶ 24} During cross-examination, Allen admitted McCord and Leonetti had been together for a year and he had met McCord previously. Allen added that he was supposed to pick the children up on Saturday. The Blazer belonged to one of Allen's car repair customers. Allen took the Blazer for a test drive to pick up the children, "[t]wo stones, one bird." (Tr. 348.)

{¶ 25} Allen recounted the events. Allen knocked on the door and stepped back, McCord came outside, upset. They were standing in the driveway between a red vehicle and the Blazer.

> So we're in between the two cars. She's arguing with me. Then she goes back to the back of the truck — the truck that I was driving, calls out the plate number, comes back up. I'm still standing in between the two cars in the front. She's yelling at me this whole time while she was on the phone [with 911]. Now I'm calling out for the kids.

---

[1] According to the medical records evidence, McCord tested negative for alcohol.

(Tr. 349.) Allen claimed he did not get into the Blazer until McCord punched him and went into the house, retrieved the hammer, and "ran * * * towards the [Blazer]" while Allen examined his lip in the mirror. Allen intended to put the car in reverse but accidentally put it in drive and veered to the left, pinning McCord to the house. Allen described hitting McCord as a "freak accident." (Tr. 354.) Allen did not call police or for an ambulance after he discovered McCord was injured because he panicked.

{¶ 26} Allen's renewed Crim.R. 29 motion reiterated that the act was not committed knowingly and was a freak accident. The motion was denied, Allen was convicted of the allied offenses and sentenced to three years in prison on Count 1.

## II. Assignments of Error

{¶ 27} Allen poses three assignments of error:

I. Allen's conviction was against the manifest weight of the evidence.

II. Allen's conviction was against the sufficiency of the evidence.

III. The sentence imposed by the trial court was erroneous, unreasonable, and contrary to law.

## III. Discussion

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 28} We combine Allen's first and second assignments of error for ease of analysis. We find that the errors lack merit.

{¶ 29} "A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence." *State v. Capp*, 8th Dist. Cuyahoga No. 102919, 2016-Ohio-295, ¶ 19.

Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. *Id.* Accordingly, an appellate court reviews a trial court's denial of a defendant's motion for acquittal using the same standard it applies when reviewing a sufficiency-of- the-evidence claim. *Id.*

*State v. Hoskin-Hudson*, 8th Dist. Cuyahoga No. 103615, 2016-Ohio-5410, ¶ 7.

{¶ 30} "'A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law.'" *State v. Parker*, 8th Dist. Cuyahoga No. 110716, 2022-Ohio-1237, ¶ 7, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry in a sufficiency challenge is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime existed beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 31} When making a sufficiency determination, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supports the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at *id.* Under a sufficiency challenge, witness credibility is immaterial; the appellate court must defer to credibility determinations of the trier of fact and only review issues of law. *Parker* at ¶ 7.

{¶ 32} A manifest weight challenge and a sufficiency of the evidence challenge are two distinct challenges to the evidence presented. *State v. Miree*, 8th Dist. Cuyahoga No. 110749, 2022-Ohio-3664, ¶ 30, citing *State v. Wilson*, 113 Ohio

St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.  A challenge to the manifest weight of the evidence "'involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins* at *id*.  Weight of the evidence examines "'the evidence's effect of inducing belief.'" *Id*., quoting *Wilson* at ¶ 25, citing *Thompkins* at 386-387.

{¶ 33} In reviewing a manifest-weight claim, the court must consider all the evidence in the record, the reasonable inferences drawn from it, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial order.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  Finally, the discretionary power to grant a new trial should be reserved for exceptional cases where "'the evidence weighs heavily against the conviction.'" *Id*., quoting *id*.

{¶ 34} Allen was convicted of R.C. 2903.11(A)(1) and 2903.11(A)(2), which provide:

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn;

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

{¶ 35} R.C. 2901.22(B) specifies:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist.  When knowledge of the existence of a particular fact is

an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

{¶ 36} Allen argues that he did not "knowingly" commit the act. The fact that McCord suffered serious physical injury is not disputed. Allen declared he was so startled that he accidentally put the car in drive and not only moved forward but moved forward at an angle that pinned McCord to the house. Allen then put the Blazer in reverse and began to back out of the driveway while McCord was still attached to the bumper, and after she was dislodged, was laying in the driveway, along with a bloodied piece of the Blazer's headlight and bumper.

{¶ 37} "Felonious assault under R.C. 2903.11(A), combined with the definition found in R.C. 2901.22(B), does not require that a defendant intend to cause 'serious physical harm,' but that the defendant acts with an awareness that the conduct probably will cause such harm." *State v. Reed*, 8th Dist. Cuyahoga No. 89137, 2008-Ohio-312, ¶ 7, citing *State v. Lee*, 10th Dist. Franklin No. 97APA12-1629, 1998 Ohio App. LEXIS 4150 (Sept. 3, 1998). "A defendant acts knowingly when, although not intending the result, he or she is nevertheless aware that the result will probably occur." *Id.*, citing *Id.*

{¶ 38} On the issue of knowledge, the jury was instructed:

A person acts knowingly regardless of his purpose or intent when the person is aware that the person's conduct will probably cause a certain result or probably be of a certain nature.

A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, that knowledge is established if a person subjectively believes that there's a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

And knowledge since you cannot look into the mind of another is determined from all the facts and circumstances in evidence.

You will decide from these facts and circumstances whether there existed at the time in the mind of the defendant an awareness of the probability that his conduct would cause serious physical harm to [McCord].

(Tr. 393-394.)

{¶ 39} The jury was also instructed regarding weighing the evidence and direct and circumstantial evidence. Over the state's objection, the jury was further instructed regarding whether Allen used force against McCord in self-defense[2] that rendered the conduct legally justifiable, and on the inferior offense of aggravated assault.[3] We presume that the jury followed the trial court's instructions. *State v. Walker-Curry*, 8th Dist. Cuyahoga No. 106228, 2019-Ohio-147, ¶ 35.

---

[2] Allen does not assert on appeal that the evidence supported a self-defense claim. Furthermore, self-defense is an affirmative defense and is not an element of a crime subject to a sufficiency of the evidence analysis because of due process concerns. *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 24, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35. While self-defense is subject to a manifest weight challenge, this court does not find that the conviction in this case is against the manifest weight of the evidence.

[3] "Aggravated assault is an inferior degree of felonious assault because its elements are identical to or contained within the offense of felonious assault, coupled with the additional presence of one or both mitigating circumstances of sudden passion or a sudden fit of rage brought on by serious provocation occasioned by the victim." (Internal citations omitted.) *State v. Martin*, 2018-Ohio-1098, 109 N.E.3d 652, ¶ 8 (8th Dist.).

{¶ 40} The jury heard the testimony of the police, the victim, and Allen, were privy to McCord's medical evidence, listened to the 911 call, and viewed photographs of the scene. While Leonetti did not testify at the trial, Leonetti provided information to police that was consistent with McCord's testimony and the evidence.

{¶ 41} Based on our review of the record, we find that Allen's conviction for felonious assault is legally sufficient and is not against the manifest weight of the evidence.

{¶ 42} The first and second assigned errors are overruled.

**B. Sentence Contrary to Law**

{¶ 43} We review felony sentences under the standard set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231. R.C. 2953.08(G)(2) provides that an appellate court may increase, reduce, modify, or vacate and remand a felony sentence if the court clearly and convincingly finds either that the record does not support the sentencing court's findings, or the sentence is otherwise "contrary to law."

{¶ 44} A sentence is not contrary to law if the trial court considered the purposes and principles of sentencing under R.C. 2929.11 and the seriousness and recidivism factors listed in R.C. 2929.12, properly applied postrelease control, and imposed a sentence within the applicable statutory range. *State v. Lenard*, 8th Dist. Cuyahoga No. 105998, 2018-Ohio-3365, ¶ 79, citing *State v. A.H.*, 8th Dist. Cuyahoga No. 98622, 2013-Ohio-2525, ¶ 10.

{¶ 45} Allen's third and final assignment of error contends the sentence was unreasonable and contrary to law. Specifically, Allen charges the trial court "said nothing about: (1) the appellant's lack of a prior record; (2) the issue of recidivism; (3) the need to protect the public; etc." Appellant's brief, p. 11. These factors were presented to the trial court as mitigating factors during sentencing. McCord also made a statement to the trial court.

{¶ 46} The trial court declared it had "taken into account everything I know about you and your case which is considerable" including "the presentence report, supervised release officer's report regarding Allen's multiple positive tests for alcohol and marijuana [and] comments during sentencing." (Tr. 489-490.) "I am also taking into account the sentencing laws of Chapter 2929 of the Ohio Revised Code." (Tr. 490.)

{¶ 47} Although the trial court must consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors listed in R.C. 2929.12, the court is not required to make findings or give reasons for its sentence. *State v. Pavlina*, 8th Dist. Cuyahoga No. 99207, 2013-Ohio-3620, ¶ 15, citing *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. "A trial court's general statement that it considered the required statutory factors, without more, is sufficient to fulfill its obligations under the sentencing statutes." *Id*. at ¶ 10, citing *State v. Wright*, 8th Dist. Cuyahoga No. 95096, 2011-Ohio-733, ¶ 4.

{¶ 48} The trial court's judgment entry provides, "[t]he court considered all required factors of the law." Journal entry No. 122994783, p. 2. (signed Apr. 4,

2022, and filed May 20, 2022). "This court has held that a trial court's statement in its sentencing journal entry that it considered the required statutory factors, without more, is sufficient to fulfill its obligations under R.C. 2929.11 and 2929.12." *State v. Paulino*, 8th Dist. Cuyahoga No. 104198, 2017-Ohio-15, ¶ 37, citing *State v. Gonzalez*, 8th Dist. Cuyahoga No. 102579, 2015-Ohio-4765, ¶ 6. In addition, because courts have full discretion to impose sentences within the statutory range, a sentence imposed within the statutory range is "presumptively valid" if the court considered the applicable sentencing factors. *Id.*, citing *State v. Collier*, 8th Dist. Cuyahoga No. 95572, 2011-Ohio-2791, ¶ 15.

{¶ 49} Therefore, the third assignment of error is overruled.

## IV. Conclusion

{¶ 50} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, ADMINISTRATIVE JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS AND CONCURS WITH
THE SEPARATE CONCURRING OPINION;
SEAN C. GALLAGHER, J., CONCURS (WITH SEPARATE OPINION)

SEAN C. GALLAGHER, J., CONCURRING:

{¶ 51} I concur with the majority's conclusions and analysis, but that analysis must be placed into context. The majority's conclusion is directly based on the arguments as presented by the parties. With respect to the third assignment of error, Allen challenges the length of his prison term imposed on the individual felony offense under R.C. 2953.08(G)(2). Appellate review of a three-year stated minimum term for a second-degree felony is prohibited under R.C. 2953.08(A). Under that division of the appellate sentencing review statute, an offender may appeal a maximum definite or longest stated minimum sentence under subdivision (A)(1), a sentence imposed upon a fourth- or fifth-degree felony or felony drug offense under subdivision (A)(2), a sentence imposed upon certain offenses through R.C. 2971.03 under subdivision (A)(3), a sentence that is contrary to law under subdivision (A)(4), or a sentence that consists of an additional prison term through

R.C. 2929.14(B)(2)(a) under subdivision (A)(5). In addition, an offender may appeal consecutive sentences under R.C. 2953.08(G)(2)(a).

{¶ 52} None of those provisions applies, and R.C. 2953.08(G)(2) is expressly limited to appeals filed under R.C. 2953.08(A)-(C). *Id.* ("*The court hearing an appeal under division (A), (B), or (C) of this section* shall review the record, including the findings underlying the sentence or modification given by the sentencing court." (Emphasis added.)) Since the sentencing challenge does not arise under R.C. 2953.08(A)-(C), Allen's arguments pertaining to R.C. 2953.08(G)(2) are misplaced.

{¶ 53} There is no statutory basis to review the underlying sentence imposed on the solitary count in this case. As the parties recognize, the underlying sentence is within the lower end of the sentencing range under R.C. 2929.14(A)(2) and is not contrary to law. No other provision of R.C. 2953.08(A) applies to authorize appellate review of the sentence. Nevertheless, neither party has addressed this concern. As a result, I concur.