[Cite as *State v. Chatmon*, 2013-Ohio-5245.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99508**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## PIERRE CHATMON

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-555805

**BEFORE:**   Stewart, A.J., Boyle, J., and McCormack, J.

**RELEASED AND JOURNALIZED:**   November 27, 2013

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, OH    44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Denise J. Salerno
              Mahmoud Awadallah
Assistant County Prosecutors
The Justice Center
1200 Ontario Street, 8th Floor
Cleveland, OH    44113

MELODY J. STEWART, A.J.:

{¶1} A jury found defendant-appellant Pierre Chatmon guilty of murder, felonious assault, and improperly discharging a firearm into a habitation, with associated firearm specifications for all counts. The charges stemmed from an interfamily dispute that escalated to riot and murder. Guns were fired at a house, and a bullet struck and killed a 16-year-old who was hiding behind the front door of the house. The state argued Chatmon was either the primary shooter or complicit with codefendant Ramon Torres in the shooting. In this appeal, Chatmon argues that there was no evidence to establish the primary element of each offense — that he actually fired a gun — or that he acted in complicity with Torres. He also argues, among other things, that the court erred by refusing to instruct the jury on the offense of reckless homicide, that the state engaged in misconduct during closing argument, and that the court abused its discretion by allowing the jury to view autopsy photographs. We find no reversible error and affirm.

I

{¶2} Chatmon first argues that his convictions for murder, felonious assault, and improperly discharging a firearm into a habitation were unsupported by sufficient evidence to prove that he was complicit with those offenses. Although he conceded that he was armed with a 9 mm gun when the shooting occurred, he argues that the state failed to offer any proof that he discharged that gun. He notes that the police never found the gun nor did they recover any 9 mm bullet casings on the scene. In addition, he notes that

the bullet recovered from the victim was a .38 caliber, so it was different from the gun he possessed. He also argues that the state failed to offer evidence to show that he was complicit with codefendant Ramon Torres.

A

{¶3} We decide whether the evidence is sufficient to sustain a verdict by examining the evidence in the light most favorable to the prosecution and determining whether any rational trier of fact could have found that the prosecution proved the essential elements of the crime beyond a reasonable doubt. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 78, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶4} Viewing the evidence most favorably to the state shows that the 16-year-old victim arrived home from school to discover that his family's house had been ransacked and their possessions stolen. The victim called his mother to report what he found, and she in turn called her other children. They met at the house and learned from friends of the victim that "word on the street" had it that one of the perpetrators was a member of a family who lived nearby. A few of the victim's family members drove to that home to confront the alleged perpetrator; the remaining family members walked to the home.

{¶5} The victim's mother testified that she told the alleged perpetrator's mother that her son broke into the house. Angry words were exchanged, and the alleged perpetrator's mother telephoned her son. At the same time, some of the alleged perpetrator's adult siblings appeared. When the alleged perpetrator arrived home, a fight

broke out among all those present, including the mothers. An older male who was present at the home separated the mothers. This intervention caused everyone to stop fighting. Some of the victim's family ran back to their house, but the victim's mother and a few others remained on the scene.

{¶6} As the victim's mother remained at the alleged perpetrator's house, she saw a red car occupied by Chatmon and Torres drive up. Chatmon was related to the alleged perpetrator's family. Chatmon and Torres exited the car and ran toward those members of the victim's family who were walking home. Words were exchanged and according to the victim's mother, Torres "made a gesture like he had a gun." The victim's brother exchanged words with Chatmon, and he, too, believed that Chatmon had a gun. As the family members retreated to their house, the victim's brother said that he heard gunshots.

{¶7} When the victim's family returned to their house, they called the police to report the break-in. After the police left, the victim's family congregated on the front porch. They received a visit from an aunt of the alleged perpetrator who was upset that "everyone was fighting." Having obtained no satisfaction, the aunt broke off the discussion and drove away. As the aunt's vehicle turned a corner, the victim's mother saw "all these guys coming" on foot. One of the victim's family members said something that caused all ten of those on the porch to retreat into the house and call the police. The males outside the house gestured to those inside to come out, but the victim's family members remained inside for their protection. At the same time, Chatmon and Torres drove up, but they were now driving a silver car obtained in a drug

deal. Guns were fired in two volleys, separated by only moments. A bullet went through the front door of the house and struck the victim in the head, leading to his death. The bullet retrieved from the victim was .38 caliber. However, a police expert testified that two different kinds of bullets were recovered from the scene, proving that two different guns were used.

{¶8} Some of those hiding in the house saw Torres fire a gun, but none saw Chatmon fire a gun. There was, however, an eyewitness to the shooting who testified that he saw a person wearing black and green clothing firing a gun. The eyewitness testified that he had been driving down the street where the shooting occurred, close to a local bar. He saw "someone approaching the car and just started shooting across the car, to the house across the street from the bar." Surveillance video from the bar verified that Chatmon was wearing a black and green shirt and that he carried a gun.

{¶9} The same eyewitness testified that he heard two volleys of gunfire that had distinctive sounds. The eyewitness believed the different sounds indicated two different types of guns were fired.

{¶10} When the police questioned Chatmon about the murder, he said that he was present at the scene, but took off running as soon as he heard gunshots. He said that he received a call from his cousin and learned that his family members were involved in a fight with the victim's family. He and Torres then drove to the scene, but Chatmon denied being in possession of a gun at any time when the shooting occurred.

{¶11} Unbeknownst to Chatmon, the surveillance video from the bar near the scene of the shooting proved his statement to be false. The video showed Chatmon taking a gun from the waistband of his trousers and checking it for ammunition. He then proceeded to the street where he joined his compatriot in calling the victim's family out of their house. The video then showed Chatmon saying something to another person and walking out of view of the camera. Moments later, the video showed the men apparently reacting to gunshots because they covered for safety and then scattered. The video showed that Chatmon was among the last to leave the scene and was carrying a gun in his hand.

{¶12} When shown the video, Chatmon conceded that the video showed him wearing a black and green shirt. He denied, however, that the gun he carried was operable. At first he claimed that the gun did not have an ammunition clip, but that explanation evaporated because the video showed him cocking the gun. Chatmon then explained that he was only checking to see if there were bullets in the ammunition clip. At that point, he told the police that the gun was inoperable because it lacked a firing pin, although he admitted he did not discover this fact until after the shooting and further provided no explanation for how he could discover the gun was inoperable but for firing it. He claimed that Torres was the shooter, stating that Torres saw a car parked in front of the victim's house and, thinking it belonged to someone in the victim's family, said "I'm going to lite [sic] this bitch up." He claimed that he was among the last to leave the scene because the gun fell out of his trousers and he stopped to pick it up.

B

{¶13} The jury found Chatmon guilty of two counts of felony murder (one count relating to felonious assault; the other relating to improperly discharging a firearm into a habitation); ten counts of felonious assault (there were ten people in the house); and one count of improperly discharging a firearm into a habitation. In terms of being a principal offender, all of the counts depended on a finding that Chatmon fired the gun. But in terms of complicity, the jury could find him guilty if he, "acting with the kind of culpability required for the commission of an offense," aided or abetted Torres in the commission of the offense. *See* R.C. 2923.03(A)(2). So Chatmon could be found guilty for his complicity in the charged offenses regardless of whether he fired a gun, as long as he assisted or facilitated the commission of a crime, or promoted its accomplishment. *See State v. Johnson*, 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001). Even if we were to assume that the evidence did not show that Chatmon acted as a principal offender, we find sufficient evidence to show that he aided and abetted Torres such that his conviction was proper.

{¶14} Chatmon's involvement with the murder began after the victim's family went to the home of the alleged perpetrator of the burglary. In a statement to the police, he said he received a telephone call from a cousin describing the brawl at the alleged perpetrator's house and that he went to his aunt's house "to fight." Witnesses said that both Chatmon and Torres either carried guns or made motions indicating that they were armed.

{¶15} When the events of the shooting occurred several hours later, there is no question that both Chatmon and Torres were armed. Chatmon told the police that as he and Torres exited their car and prepared to join others in retaliating against the victim's family, Torres asked about a car parked in front of the victim's house and said that he was going to "lite [sic] this bitch up." Chatmon was seen in a surveillance video cocking his gun, an act he conceded was to see if there were bullets in the clip.

{¶16} This evidence was sufficient to show that Chatmon assisted or facilitated Torres in shooting the victim. Although one's mere presence or proximity to an offense is not enough to establish complicity, *State v. Brewster*, 157 Ohio App.3d 342, 2004-Ohio-2722, 811 N.E.2d 162, ¶ 45 (1st Dist.), Chatmon's participation went beyond mere presence. He and Torres were on the scene and armed for a fight. And with Torres stating that he was going to "lite [sic] this bitch up," the clear implication was that he was going to shoot. Chatmon could not complain that he was unaware that Torres would actually fire the gun. In addition, Chatmon himself was armed and shown checking his ammunition before the shooting and then fleeing the scene with the gun in his hand. This evidence was consistent with his assisting and aiding Torres in the shooting.

C

{¶17} The court instructed the jury on complicity, but did not ask the jury to make a specific finding on that point of law. It did tell the jury, in response to a question during deliberations, that "aiding and abetting" did not apply to the firearm specification.

It is unclear why the court answered as it did — the Ohio Supreme Court has held that a defendant is subject to a sentencing enhancement on a firearm specification regardless of whether he was the principal or an unarmed accomplice. *State v. Chapman*, 21 Ohio St.3d 41, 42-43, 487 N.E.2d 566 (1986). *See also State v. Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, ¶ 24 ("It is well settled that an unarmed accomplice can be convicted of an underlying felony, together with a firearm specification, based on an aider and abettor status.").

{¶18} Regardless of whether the court erred by telling the jury that a firearm specification did not apply to Chatmon if the jury found he was an accomplice, there was enough evidence to prove that the weapon he used was operable for purposes of proving the firearm specification.

{¶19} In *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph one of the syllabus states:

> A firearm enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm. (*State v. Murphy* [1990], 49 Ohio St.3d 206, 551 N.E.2d 932, *State v. Jenks* [1991], 61 Ohio St.3d 259, 574 N.E.2d 492, and *State v. Dixon* [1995], 71 Ohio St.3d 608, 1995-Ohio-178, 646 N.E.2d 453, followed; R.C. 2923.11[B][1] and [2], construed and applied.)

{¶20} The police did not recover the handgun that Chatmon used, so the state had to resort to circumstantial evidence to prove that the handgun was operable. In *State v. Hills*, 8th Dist. Cuyahoga No. 98848, 2013-Ohio-2902, we stated that "[c]ircumstantial

evidence of a firearm's operability includes the representations and actions of the individual exercising control over the weapon." *Id*. at ¶ 15.

{¶21} The video surveillance footage showed Chatmon cocking his gun. That act alone tended to show the operability of the gun because it would have been pointless for Chatmon to do so with an inoperable gun. In addition, the state's ballistics expert gave his opinion that one bullet recovered from the scene was not fired from the same gun as the bullet that killed the victim. Although the police could not match this bullet to the handgun carried by Chatmon because the handgun was not recovered, this evidence was consistent with that of the eyewitness who said that the two volleys of gunshots he heard sounded different. This indicated to the expert that two different guns were fired. Consistent with this evidence, a rational trier of fact could have found that Chatmon fired his gun, proving that it was operable.

D

{¶22} Chatmon also argues that the state failed to offer evidence sufficient to establish that he had knowledge that Torres would shoot into the house.

{¶23} To support a conviction for complicity by aiding and abetting, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. *Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus. One's presence at the scene of a crime is not enough alone to

prove complicity, but complicity can be inferred from "presence, companionship and conduct before and after the offense is committed." *Id*. at 243-245.

{¶24} The facts showing that Torres and Chatmon arrived on the scene armed and ready to fight were enough to prove Chatmon's complicity. In addition, a rational trier of fact could have found Torres's statement, that he was going to "lite [sic] this bitch up," was a direct and present indication to Chatmon of his intent to shoot. For his part, Chatmon carried a loaded gun and specifically checked his ammunition. He may not have known that Torres would fire into the house, but the circumstantial evidence was strong enough to show that Torres's act of firing into the house was such a distinct possibility that Chatmon could have expected it to occur under the circumstances.

II

{¶25} Chatmon also argues that his convictions were against the manifest weight of the evidence because the state failed to present evidence from many of the felonious assault victims who were inside the house at the time of the shooting and because his conduct was essentially similar to that of the others who did nothing more than fight.

{¶26} The manifest weight of the evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 340, 515 N.E.2d 1009 (9th Dist.1986).

**{¶27}** The jury's verdict was not a miscarriage of justice. The state had no obligation to present testimony of every person present inside the house at the time of the shooting. Persons with knowledge of the facts could competently establish who was present in the house at the time.

**{¶28}** We likewise reject Chatmon's argument that his conduct was essentially similar to that of those persons related to the victim, who were charged with aggravated riot. The differentiating fact is that Chatmon carried a gun and manifested the intent to use it. Not only did the testimony from the victim's family members uniformly show that none of them had firearms, they ran to safety when they discovered that Chatmon carried a handgun. Chatmon's conduct was distinctly different from that of the other persons on the scene at the time of the shooting and warranted that he be charged with different offenses.

### III

**{¶29}** At the close of evidence, Chatmon asked the court to instruct the jury on the lesser included offense of reckless homicide. He theorized that whether acting as a principal or in complicity with Torres, he only intended to shoot the car parked in the front of the victim's house, but missed the target and hit the house instead. The state opposed the proposed instruction on grounds that Chatmon engaged in a purposeful act in shooting. The court refused to give the instruction, finding no basis for concluding that Chatmon, as either a principal offender or acting in complicity with Torres, was reckless in discharging a firearm.

**{¶30}** There is a two-tiered analysis for determining whether a particular offense should be submitted to the trier of fact as a lesser included offense: (1) is the offense a lesser included offense of the charged offense, and (2) could the trier of fact reasonably find the defendant not guilty of the charged offense, but convict the defendant of the lesser included offense. *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6.

**{¶31}** Reckless homicide is a lesser included offense of murder, *State v. Benson*, 8th Dist. Cuyahoga No. 87655, 2007-Ohio-830, ¶ 112, so the only question is whether the facts presented at trial could reasonably support an acquittal on murder and a conviction for reckless homicide. Because the decision of whether to give a lesser included offense instruction requires the court to consider the facts, the court has discretion when determining whether the record contains sufficient evidence to support the requested instruction. *State v. Henderson*, 8th Dist. Cuyahoga No. 89377, 2008-Ohio-1631, ¶ 10, citing *State v. Wright*, 4th Dist. Scioto No. 01 CA2781, 2002-Ohio-1462.

**{¶32}** Reckless homicide as defined in R.C. 2903.041 differs from murder only with respect to the culpable mental state: murder in violation of R.C. 2903.02 requires that the offender act "purposely" to cause the death of another; reckless homicide requires proof that the accused acted "recklessly." "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶33} The court gave the following reasons as to why it would not give a reckless homicide instruction:

> If [Chatmon and Torres] went down there to feloniously assault these people, if they went down there to shoot up the house, shoot up the car, I mean, those are acts that are intended. And when they result in death, I don't believe the proper charge down [sic] is reckless homicide.

{¶34} We take the court's reasoning to be that both Chatmon and Torres were on the scene committed to harming the victim's family, so their intentional act of shooting a gun made them responsible for the natural and probable consequences of that act. Viewed in that manner, we agree that the court did not abuse its discretion by refusing the instruction.

{¶35} The court had uncontested evidence that Chatmon and Torres were twice on the scene, and convincing evidence to show that on both occasions they were armed with handguns. As Chatmon conceded to the police, he and Torres went to the scene a second time with the intent to fight. When the victim's family retreated into their house, Chatmon and his compatriots were seen beckoning the victim's family out of the house. The family refused to exit the house and shots were fired just seconds later.

{¶36} Four shots struck the house: two in the front door, one on the second floor porch, and one on the third floor of the house. The shooters plainly knew the house was occupied, so the act of shooting the occupied house made them responsible for the natural and probable consequences of doing so.

{¶37} Chatmon argued that Torres was only aiming for the car that sat between them and the house. It was not entirely clear whether the car was parked in a direct path

between the shooter and the house (a police detective said, in reference to the position of the car, "I can't really say the path, but it's in front of the house). There was some evidence to support this argument — several months after the shooting, the police learned for the first time that the car had a bullet hole in the driver's door. The police were unable to recover the bullet to match it against those bullets recovered from the scene, so the bullet hole neither proved nor disproved Chatmon's theory that Torres was merely shooting at the car.

{¶38} Other evidence tended to contradict the theory that Torres was only shooting at the car. There was evidence that shots were fired by two different guns and more bullets struck the house than the car: bullets struck the upper levels of the house, making it highly improbable that the shooters could have missed their target so badly. With this evidence, the court could reasonably find that Chatmon and Torres purposely shot at the house knowing that it was occupied. So the facts did not reasonably support an acquittal on the murder charge and a conviction for reckless homicide.

IV

{¶39} Chatmon next argues that the court abused its discretion by allowing the state to display gruesome autopsy photographs of the victim. He maintains that the cause of death was uncontested so the state's sole purpose for using the photographs was to inflame the passions of the jury.

{¶40} At trial, Chatmon did not object to the admission of the photographs on the basis that they were gruesome — defense counsel told the court that "[p]hotographs

depicting the wound, we do not object to." Having waived any objection to the admission of photographs of the wound, Chatmon cannot complain on appeal that those photographs were gruesome. Indeed, he invited the claimed error. *State v. Smith*, 148 Ohio App.3d 274, 2002-Ohio-3114, 772 N.E.2d 1225, ¶ 30 (8th Dist.).

{¶41} Apart from Chatmon waiving any error relating to the gruesomeness of the photographs, the state is entitled to offer evidence showing the cause of death, even if the cause of death is uncontested, to give the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans*, 63 Ohio St. 3d 231, 251, 586 N.E.2d 1042 (1992). Nevertheless, the admission of autopsy photographs, like all other evidence, must pass the initial test of relevancy, and their probative value must outweigh the danger of material prejudice to the defendant. *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), paragraph seven of the syllabus.

{¶42} The five, full-body autopsy photographs of the victim were irrelevant. They did not depict the gunshot wound so they did not serve to give the jury an appreciation of the nature and circumstances of the crime. The court likewise should not have admitted a close-up photograph of the victim's face that did not show the gunshot wound — that photograph had no evidentiary value of any kind. Finally, two photographs showing the victim's right and left hands, respectively, contained no probative evidence of the crime and thus had no evidentiary value. There being no evidentiary value whatsoever to these photographs, we can only conclude that the state offered these photographs into evidence for the sole purpose of appealing to the jurors'

passions. On that basis, they were materially prejudicial to the defense and should not have been admitted into evidence.

{¶43} Despite the court's error in admitting these autopsy photographs, we cannot say that their admission deprived Chatmon of a fair trial. When publishing the photographs to the jury, the court explained that the photographs "are evidence of what goes on during an autopsy, the procedure that is used, and the findings of the physician in question." Importantly, the court then told the jurors that they "may not find [the photographs] particularly relevant to the decision that you must make." Whether the jury did find the photographs relevant is unknown. But the state did offer substantial, relevant evidence of Chatmon's complicity in the shooting; namely, the surveillance video showing Chatmon holding a gun both before and after the shots were fired. This evidence was so strong that any prejudicial effect of allowing inadmissible autopsy photographs into evidence was harmless.

V

{¶44} During the state's closing argument, it explained certain legal definitions like the terms "knowingly," "attempt," and "impossibility" in paraphrase of the statutory definition. Chatmon argues that the state got some of these definitions wrong; for example, telling the jurors that his "intent is to shoot. We all know to shoot is to kill, and that was the result there." He argues that the state's argument misled the jury and that trial counsel was ineffective for failing to object.

A

**{¶45}** Chatmon concedes that he did not object to the state's closing argument, so he has forfeited all but plain error. *See* Crim.R. 52(B). This means that he can prevail on this assignment of error only if the error affected Chatmon's substantial rights and but for the error, the outcome of the trial would clearly have been different. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

**{¶46}** Chatmon makes no argument that the instructions given by the court on the relevant terms defining the charged offenses were incorrect in any way. The court made it clear to the jury that closing arguments were not evidence and that it would instruct the jury on the applicable law. When it did give its instructions, it informed the jury that it had to "decide the case based upon the law that I instruct you on" and that "[y]ou have to accept the law as it is and you are to apply it throughout your entire deliberations * * *." The court also permitted the jury to take its instructions into deliberations. A jury is presumed to follow the instructions given to it by the judge, *State v. Henderson*, 39 Ohio St.3d 24, 33, 528 N.E.2d 1237 (1988), and nothing in this case suggests that the jury did otherwise. Chatmon has failed to show any prejudice, so no plain error exists.

B

**{¶47}** To succeed on his ineffective assistance of counsel claim, Chatmon must show that: (1) counsel's failures fell below an objective standard of reasonableness and (2) counsel's deficient performance was prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show prejudice in an ineffective assistance of counsel claim, the defendant must demonstrate "a reasonable

probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

**{¶48}** As previously noted, Chatmon has no complaint with the jury instructions given by the court. Those instructions clearly told the jury that it must follow the definitions of statutory elements given by the court, not counsel. The presumption that the jury follows the court's instructions holds here. We find no reasonable probability that anything the state said in closing argument caused the jury to disregard the court's instructions to arrive at a verdict of guilty.

VI

**{¶49}** During sentencing, the court credited Chatmon with jail-time served, but did not state the number of days credited. Chatmon argues this was error. We find no error. At the time of his indictment, Chatmon was being held in jail on two separate cases: CR-555151 and CR-556026. A defendant cannot receive jail-time credit when he serves time for unrelated offenses while in jail awaiting trial on separate charges. *See State v. Logan*, 71 Ohio App.3d 292, 300, 593 N.E.2d 395 (10th Dist.1991); *State v. Harper*, 6th Dist. Sandusky No. S-10-005, 2010-Ohio-6518, ¶ 13. The court's statement that Chatmon was entitled to jail-time credit appeared to have been made by rote. The statement was essentially meaningless because Chatmon was held on other charges and was not entitled to any credit.

VII

**{¶50}** Finally, Chatmon argues that the court erred by failing to merge the ten felonious assault counts, conceding that this court has held that felonious assault convictions resulting from a single course of conduct that results in different named victims do not merge. *See, e.g., State v. Snuffer*, 8th Dist. Cuyahoga Nos. 96480, 96481, 96482, and 96483, 2011-Ohio-6430, ¶ 4 ("[w]hen an offense is defined in terms of conduct towards another, then there is dissimilar import for each person affected by the conduct"). Given this concession, we overrule the assignment of error.

**{¶51}** Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MELODY J. STEWART, ADMINISTRATIVE JUDGE

MARY J. BOYLE, J., and
TIM McCORMACK, J., CONCUR