[Cite as *State v. Maxey*, 2024-Ohio-1279.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 112981 |
| v. | : | |
| DERRICK MAXEY, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 4, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-668584-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl J. Mazzone, Assistant Prosecuting Attorney, *for appellee.*

Susan J. Moran, *for appellant.*

ANITA LASTER MAYS, J.:

{¶ 1} Defendant-appellant Derrick Maxey ("Maxey") appeals his criminal convictions for aggravated murder, murder, and felonious assault. We affirm the trial court's judgment.

## I. Background and Facts

{¶ 2} On March 22, 2022, Maxey was indicted for acts surrounding the murder of victim Lamont Weeks ("Weeks") the night of March 5, 2022, in the area of East 105th Street and Greenlawn Avenue in the city of Cleveland with the followings counts:[1]

One – aggravated murder, R.C. 2903.01(A), did purposely, and with prior calculation and design, cause the death of Lamont Weeks.

Two – aggravated murder, R.C. 2903.01(B), did purposely, and with prior calculation and design, cause the death of Lamont Weeks while committing or attempting to commit the offense of aggravated robbery.

Three – murder, R.C. 2903.02(A), did purposely cause the death of Lamont Weeks.

Four – murder, R.C. 2903.02(B), did cause the death of Lamont Weeks as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, to wit: felonious assault, in violation of Section 2903.11(A)(1) of the Revised Code.

Five – murder, R.C. 2903.02(B), did cause the death of Lamont Weeks, as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, to wit: aggravated robbery, in violation of Section 2911.01(A)(3) of the Revised Code.

Six – felonious assault, R.C. 2903.11(A)(1), did knowingly cause serious physical harm to Lamont Weeks.

Seven – aggravated robbery, R.C. 2911.01(A)(3), did, in attempting or committing a theft offense, as defined in section 2913.01 and 2913.02 of the Revised Code, or in fleeing immediately after the attempt or offense upon Lamont Weeks did inflict, or attempt to inflict, serious physical harm on Lamont Weeks.

---

[1] Counts 4 and 5 were amended to insert the correct code sections for felonious assault and aggravated robbery respectively under the "to wit" portions of the indictments.

{¶ 3} Maxey elected to have the case tried to the bench. Trial began on June 14, 2023.

{¶ 4} Shavel Smith ("Smith") testified that she and her brother were walking near the intersection of East 105th Street and Greenlawn Avenue on the evening of March 5, 2022, when they saw the victim's body lying on the sidewalk bleeding and nonresponsive. Smith called 911 and gave a statement to the Cleveland Police Department ("CPD") upon arrival. Smith told police that she saw an individual who appeared to be wearing a hoodie standing over the body and walked away as she and her brother approached.

{¶ 5} The body was in the EMS ambulance when CPD patrol officer Michael Dawson ("Ofc. Dawson") and his partner patrol officer Mazanec ("Ofc. Mazanec") arrived at the scene. Ofc. Mazanec, who was no longer with CPD at the time of trial, talked with Smith. The officers alerted their sergeant and the fire department and outlined the area where they observed a puddle of blood with crime-scene tape.

{¶ 6} CPD homicide detective Daniel Lentz ("Det. Lentz") photographed the scene and potential evidence to be collected. The detective described the photographs, evidence markers, and blood sample collection. Evidence included a bag with two cans of beer and footprints in the blood evidence. On March 9, 2022, Det. Lentz was called by the homicide unit to photograph a male in custody and his clothing. Tr. 59. The photographs contained various views of a brown Carhartt jacket with a hood and markings including soil on the chest; black belted jeans with

soil and debris on the cuff with no size indicator; a black zip-up hooded sweatshirt with front middle pocket; a soiled white t-shirt with suspected blood and "cuttings"; a pair of size 12 white Reebok tennis shoes with red striping and yellow laces; one pair of round eyeglasses; wallet, Maxey's ID; a ring; Carmex lip balm; pen, and other items; close-up of Maxey's identification, and a credit card with the name "punkinhead." Tr. 72.

{¶ 7} During cross-examination, Det. Lentz stated he was not aware that the fire department hosed down the crime scene before his arrival and admitted that "if that's what happened," "it was irregular" to do so before photographs were taken. The detective did not recall seeing blood on any of the clothing items other than suspected blood on the t-shirt. All of the clothing items appeared to be soiled.

{¶ 8} Tom Ciula ("Ciula"), the operator of the CPD forensic audio and video laboratory, testified. Ciula collected videos from four different sites and determined that two "were germane to the case." Ciula "took those two sites, worked that video in such a such a way that it showed the incidents, again, surrounding the homicide." Tr. 89. The video clocks were synchronized to show the accurate times on the video extractions. Ciula extracted "areas of interest" from the overall video and turned some of the images into enlarged still shots for identification purposes.

{¶ 9} A security video was secured from a business located across the street from the scene where the body was located at 966 East 105th Street and an excerpt beginning at 19:49:22 or 7:49 p.m. was played for the court. This court's review of

the video showed Weeks walking down the street when what appeared to be a male approach Weeks from behind. The individual was wearing what appeared to be dark pants, white shoes, and possibly a gray, brown, or tan jacket with a white t-shirt hem hanging below the jacket.[2]

{¶ 10} The assailant swung an unknown item with two hands and hit the head area of the victim, who immediately dropped to the ground. The assailant repeatedly struck the victim, who did not seem to be moving, picked up and dropped the victim's limp arm, and appeared to go through the victim's clothing. The assailant returned the way he came.

{¶ 11} A second male arrived a few minutes later and walked around the body a few minutes and crouched down beside the body several times. A third male exited a vehicle and walked over while traffic continued to pass by. The second male left, and the third male returned to the vehicle he was riding in and rode away. A silver van pulled up as the third male rode away. A male exited a silver van and walked over to speak with a female standing on the corner across the street from the victim. The male flagged down the fire department. An enlarged version of the attack portion of the video was somewhat blurry but showed that the assailant was wearing a white t-shirt.

---

[2] Ciula explained that the shading of the clothing colors was affected by the infrared night camera that shows shades of light or dark colors while the more illuminated items like the red fire truck showed truer color. Tr. 108. "You are able to identify the difference between light and dark, white and some version of some other gray scale of white and the same with black and other gray scales of black, yes."

{¶ 12} Videos were also obtained from Lucky's Convenience Store ("Lucky's") at 1082 East 105th Street beginning with a time of 23:01:37 or 11:01 p.m. were also shown to the court. A review of the videos depicted a male of similar size and girth of the assailant wearing clothing that appeared to be the same clothing worn by the assailant entering the store and purchasing five cans of what appeared to be beer using a blue debit or credit card that was swiped with no PIN entered. It appears that something large and heavy was in the left pants pocket, and the pants were hanging very low.

{¶ 13} Dr. Elizabeth Mooney ("Dr. Mooney") with the Cuyahoga County Medical Examiner's office performed the autopsy to determine the cause of death, accompanied by photographs and a report. Death was caused by at least 12 blunt-force head injuries. Dr. Mooney testified concerning 42 autopsy photographs.

{¶ 14} The doctor viewed the security video of the murder. Based on the linear injuries, the doctor opined that the weapon was a long, rounded object that was moderately thin due to the lack of large, depressed skull fractures. Toxicology reports revealed nicotine, marijuana, and PCP were present, and alcohol was over three times the legal limit. Dr. Mooney was unable to give a definitive opinion regarding whether there would be blood spatter stating, "It is not something that we test for at the time of autopsy." Tr. 134.

{¶ 15} Sontonio Hollis ("Hollis") also testified and confirmed that his pending case was not related to the instant case, and the state did not promise him anything to appear. Hollis resided on Columbia Avenue, which intersected with

East 105th Street, with his brother and girlfriend. The evening of the incident, victim Weeks, also known as "Poo[h]," was at the house as well as Maxey, who was also known as "Punkin." The group was drinking and talking when tension arose between Maxey and Weeks. Maxey was "yelling" at Weeks that "he was getting out of pocket; he was out of line in what he was doing." Tr. 140.

{¶ 16} Except for a short while when Hollis and Weeks left the house, the group continued drinking and talking. Weeks, who usually travelled down East 105th Street to go home, eventually left. Hollis later followed to "break up the fight" between Maxey and Weeks. Tr. 144. Hollis identified himself in the security video approaching Weeks's body lying on East 105th Street. Hollis tried to see whether Weeks was alright, picked up Weeks's cell phone, and departed as the ambulance arrived. Hollis identified Maxey in the still shot excerpts from the Lucky's store video and stated Maxey was wearing the same clothing earlier in the evening. He also identified Maxey's skull tattoo. Hollis returned to the house after he encountered Weeks's body. He saw Maxey the next day who was wearing the same clothing he was wearing the day before, but Hollis did not see blood. Hollis told police he had never seen Maxey with any weapons or involved in a fight.

{¶ 17} Hollis admitted during cross-examination that no physical altercation took place between Weeks and Maxey during their argument. He denied that the three smoked a marijuana cigarette dipped in PCP the night of the incident but admitted their prior use.

{¶ 18} Forensics expert Curtiss Jones ("Jones") served as supervisor of the trace evidence unit of the Cuyahoga County Medical Examiner's Office ("CCMEO"). Samples were collected from Weeks's hands and fingernails including suspected blood stains from his left hand. Upon evaluation of apparent blood on the clothing, no blood samples were collected.

{¶ 19} Evidence provided by the CPD and attributed to Maxey was examined for blood. Stains on a white t-shirt, jeans, right shoe, and watch tested "presumptive positive." "Presumptively positive for blood" does not mean that the substance is blood but indicates "the possible presence of blood." Tr. 183, 187. Examination results were documented in a report. Forty-three photographs were also taken.

{¶ 20} Apparent blood was located on various clothing items belonging to Weeks with no chemical testing performed. No bloodstains were visually evident on Weeks's shoes. Maxey's articles that tested presumptively positive for blood were two portions of his t-shirt, right shoe, left side of his jeans' waistband, a portion of the lining of the left front pocket of the jeans, surface of a yellow wristwatch, and watch band.

{¶ 21} Forensic scientist Carey Baucher ("Baucher") with the DNA department of the Cuyahoga County Regional Forensic Science Laboratory tested the evidence for DNA and memorialized findings in a report. Baucher could not definitively say that Maxey's DNA was not on samples from the pockets of Weeks's gray sweatpants. "I can't say that there is a match, but I can't exclude him either.

So, it is a gray area unfortunately for us." Otherwise, Baucher stated, there was no DNA evidence "that can be reported as a match" to Maxey.  Tr. 213.

{¶ 22} CPD homicide detective Andrew Hayduk ("Det. Hayduk") arrived at the scene at about 8:30 p.m. and assisted with the video evidence acquisition. Det. Hayduk testified regarding a video from the building reflecting that at 10:58 p.m., an individual who appeared to be the same individual that attacked Weeks walked past the area where Weeks was attacked, headed south, and continued out of view toward Lucky's.[3]  He also testified about the Google Maps depicting the relevant locations in the case and distance between them.

{¶ 23} The victim's family informed police that Maxey may have been involved.  Further, they advised that Maxey lived at the Columbia Avenue address (where Hollis also resided), and a search warrant was secured.  The sole item retrieved was a piece of mail with Maxey's name located in a bedroom. Hollis and his brother were interviewed, and an arrest warrant was issued for Maxey.

{¶ 24} The defense summarized, and Det. Hayduk confirmed that the search warrant resulted solely from the envelope addressed to Maxey.  The detective stated Hollis told police during the search that items that appeared to be "potential tools" or "makeshift weapons" belonged to him, and he planned to scrap them.  Tr. 239.

---

[3] The first Lucky's video was timed 23:01:37 or 11:01 p.m.

{¶ 25} The trial court denied Maxey's Crim.R. 29 motion for judgment of acquittal requesting that all charges be dismissed. The defense presented no witnesses, and the renewed motion was also denied.

{¶ 26} On June 15, 2023, Maxey was convicted of:

Count 1 – aggravated murder, R.C. 2903.01(A), did purposely, and with prior calculation and design, cause the death of Lamont Weeks;

Count 3 – murder, R.C. 2903.02(A), did purposely cause the death of Lamont Weeks.

Count 4 – murder, R.C. 2903.02(B), did cause the death of Lamont Weeks as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, to wit: felonious assault, in violation of Section 2903.02 of the Revised Code; and

Count 6 – felonious assault, R.C. 2903.11(A)(1), did knowingly cause serious physical harm to Lamont Weeks.

{¶ 27} Counts 1, 3, 4, and 6 merged for purposes of sentencing. The state elected to sentence on Count 1. The trial court imposed a prison term of "life with [a] possibility of parole after 20 years." Journal entry No. 150302418, p. 1., (June 22, 2023).

{¶ 28} Maxey appeals.

## II. Assignments of Error

{¶ 29} Maxey assigns four errors for analysis:

I. The state did not present sufficient evidence of Mr. Maxey's prior calculation and design as to the aggravated murder counts.

II. The state did not present sufficient evidence of Mr. Maxey's guilt as to all counts.

III. The trial court erred in allowing the state to present cumulative, gruesome, and mildly probative photos to the prejudice of Mr. Maxey.

IV. The trial court abused its discretion when it denied Mr. Maxey's oral motion for new appointed counsel.

## III. Discussion

### A. Prior calculation and design and insufficient evidence

{¶ 30} The first error assigned is that the evidence was insufficient to support prior calculation and design. Maxey contends in the second assigned error that the evidence was insufficient to support all counts.

{¶ 31} Maxey's convictions were merged into the aggravated murder count. As a result, Maxey was not sentenced on the merged counts. "When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless." *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990). *See also State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23, quoting *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 12 ("For the purposes of R.C. 2941.25, a 'conviction' consists of a guilty verdict and the imposition of a sentence or penalty.") (Emphasis sic.) A defendant cannot challenge a conviction that was merged because "[t]he counts that merged with the aggravated murder conviction are not convictions, and therefore, we cannot individually review the evidence supporting those findings of guilt." *Worley* at ¶ 23.

{¶ 32} Therefore, this court reviews the sufficiency of the evidence supporting the aggravated murder conviction, only.

## 1. Standard of Review

{¶ 33} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Capp*, 8th Dist. Cuyahoga No. 102919, 2016-Ohio-295, ¶ 19. Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. *Id.* Accordingly, an appellate court reviews a trial court's denial of a defendant's motion for acquittal using the same standard it applies when reviewing the sufficiency of the evidence claim. *Id.*

{¶ 34} "'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Bradley*, 8th Dist. Cuyahoga No. 108983, 2020-Ohio-3460, ¶ 6, quoting *State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 101, citing *State v. Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997).

{¶ 35} "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at ¶ 7, citing *State v. Vickers*, 8th Dist. Cuyahoga No. 97365, 2013-Ohio-1337, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

## 2. Analysis

{¶ 36} R.C. 2903.01(A), aggravated murder, provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." "The element of prior calculation and design 'require[s] a scheme designed to implement the calculated decision to kill.'" *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 31, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 37} Maxey argues there is no evidence of prior calculation and design. "'Whether a defendant acted with prior calculation and design is determined on a case-by-case basis, following an analysis of the specific facts and evidence presented at trial.'" *State v. Smith*, 2021-Ohio-1185, 169 N.E.3d 1014, ¶ 9 (8th Dist.), quoting *State v. Hicks*, 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, ¶ 41, citing *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 77.

{¶ 38} "'Prior calculation and design'" have been interpreted to mean more than a momentary deliberation; it requires a "'scheme designed to implement the calculated decision to kill.'" *Id.*, quoting *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38-39, quoting *Cotton*, 56 Ohio St.2d at 8, 11, 381 N.E.2d 190. "'While "[n]either the degree of care nor the length of time the offender

takes to ponder the crime beforehand are critical factors in themselves," "momentary [or immediate] deliberation is insufficient."'" *Id.*, quoting *id.*, quoting *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993), and the 1973 Legislative Service Commission Comment to R.C. 2903.01.

> The apparent intention of the General Assembly in employing the phrase "prior calculation and design" was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill.

*Id.*, quoting *Cotton* at 8, 11.

{¶ 39} "If the defendant had sufficient time and opportunity for the planning of an act of homicide, and 'the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.'" *Smith*, 2021-Ohio-1185, 169 N.E.3d 1014, ¶ 9, quoting *Hicks*, 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, ¶ 41, citing *Cotton*, paragraph three of the syllabus.

{¶ 40} Thus,

> [t]he state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways, including: (1) "evidence of a preconceived plan leading up to the murder"; (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded" or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 75, citing *State v. Dunford*, 11th Dist. Ashtabula No. 2009-A-0027, 2010-Ohio-1272, ¶ 53; *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218 (10th Dist.); *State v. Hough*, 8th Dist. Cuyahoga No.

91691, 2010-Ohio-2770, ¶ 19 ("[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design.").

*Hicks* at ¶ 40.

{¶ 41} "There is no 'bright-line test' for determining the presence or absence of prior calculation and design; however, the Ohio Supreme Court has identified several factors to be weighed along with the totality of the circumstances surrounding the murder in determining the existence of prior calculation and design." *Id.* at ¶ 41. Those factors include "whether the defendant and the victim knew each other and, if so, whether the relationship was strained; whether there was thought or preparation in choosing the murder weapon or murder site; and whether the act was 'drawn out' or 'an almost instantaneous eruption of events.'" *Id.*, citing *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), citing *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

{¶ 42} Maxey concedes that the fact that the parties knew each other and had argued works in the state's favor, but denies the factors support a planned and executed murder of a friend by someone with no history of violence shortly after "returning from a brisk late winter stroll." Appellant's brief, p. 8. Maxey also denies that the video shows Maxey lurking, waiting on Weeks's arrival, choosing a point of ambush, or obtaining a weapon to implement a plan.

{¶ 43} The state argues that the testimony at trial established prior calculation and design. The parties argued at the house on Columbia Avenue as Hollis testified, and Maxey and Weeks left the house separately but close in time.

The state also contends that after the parties left the house the first time, they returned and continued to argue. Additionally, the state offers that the video depicts Maxey "sneaking around the corner onto E. 105, literally creeping up behind Mr. Weeks, and then striking him repeatedly before taking off * * * lying in wait and then tiptoeing behind someone before bludgeoning them to death." Brief of appellee, p. 7-8.

{¶ 44} Hollis testified the parties were with others talking and drinking alcohol at the Columbia Avenue house in the late "afternoon reaching evening" when a "fall-out" began between Maxey and Weeks. Tr. 138, 140. Maxey was yelling at Weeks that he was "getting out of pocket, he was out of line in what he was doing." Tr. 138. Hollis and Weeks left the house.[4] Weeks "stopped on Morrison [Avenue] to holler at some people" he knew, and Hollis proceeded to his destination. Tr. 139-140. They returned to the Columbia Avenue house separately where they resumed drinking and talking with others.

{¶ 45} Asked why he decided to go down to East 105th shortly after Weeks left the residence, Hollis replied, "To follow behind the crowd. * * * I can't remember if I was actually following because I knew he was fixing to leave. I knew he was leaving." Tr. 141-142. Hollis subsequently stated that he followed Weeks:

Hollis: To stop the fight.

---

4 During cross-examination, defense counsel said Hollis, Weeks, and Maxey went for a walk after the argument and asked Hollis to confirm that everything was cool, which Hollis did, but Hollis testified during direct examination that he and Weeks went for a walk after the argument.

State: The fight between [Weeks] and who?

Hollis: [Maxey].

State: And was anybody else following Weeks?

Hollis: No.

Tr. 144-145.

{¶ 46} The infrared night view of the incident video showed Weeks emerge from Columbia Avenue, walk southerly down East 105th Street, and cross the intersection of Greenlawn Avenue and East 105th Street. As Weeks passed the building on the corner of the intersection, a male assailant appeared from Greenlawn Avenue, turned left onto East 105th Street and walked behind Weeks. Just as the assailant reached Weeks, Weeks turned his head to look toward the assailant who used both hands to swing the unidentified blunt object with such force that Weeks dropped to the ground immediately. Weeks was hit repeatedly as he lay motionless on the ground; the assailant checked Weeks's clothing and returned to Greenlawn Avenue. A few minutes later, as Hollis confirmed at trial, Hollis emerged from Columbia Avenue and walked down the street to Weeks's body.

{¶ 47} Hollis described the clothing Maxey was wearing that night as the same clothing Maxey was wearing in the Lucky's video. The height, girth, gait, and clothing of the assailant matched that of Maxey in the Lucky's video. Maxey's DNA could not be excluded from the test of Weeks's pants pocket, and Maxey was seen rifling through Maxey's clothing after the assault. Hollis went to East 105th Street

to stop Maxey and Weeks from fighting. Weeks's family told police Maxey may have been involved.

{¶ 48} This court finds based on the totality of the circumstances that Maxey was the assailant and the elements of aggravated murder have been met. "[C]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. Based on the evidence, this court cannot say that the state's theory of events is implausible. In addition, the repeated bludgeoning of the victim as he lay motionless on the ground constituted a cold-blooded, execution-style killing. "[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury [or trial court as factfinder] may infer prior calculation and design." *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2010-Ohio-2770, ¶ 19.

{¶ 49} This court determines after viewing the evidence in a light most favorable to the prosecution, the evidence was sufficient to support the essential elements of aggravated murder beyond a reasonable doubt.

{¶ 50} The first and second assignments of error are overruled.

## B. Prejudicial photographic evidence

{¶ 51} Maxey argues that the assailant's identity was the main issue in the case and the highly prejudicial, needlessly cumulative, gruesome autopsy photographs were offered only to prejudice, confuse, or mislead the factfinder under Evid.R. 403, which states as follows:

(A) Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(B) Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

{¶ 52} Decisions on the admissibility of photographs are left to the sound discretion of the trial court. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 138; *State v. Slagle*, 65 Ohio St.3d 597, 601, 605 N.E.2d 916 (1992).

{¶ 53} Maxey's failure to object during trial waives all but plain error.

Under Crim.R. 52(B), a plain error affecting a substantial right may be noticed by an appellate court even though it was not brought to the attention of the trial court. However, an error rises to the level of plain error only if, but for the error, the outcome of the proceedings would have been different. *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 61; *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *Long* at 97.

*State v. Bouie*, 8th Dist. Cuyahoga No. 108095, 2019-Ohio-4579, ¶ 42.

{¶ 54} The state explains that the 42 autopsy photographs were presented to show the 12 documented injuries, internal hemorrhaging, and the body itself in support of the security video showing the brutal assault.

{¶ 55} This court has stated that

"[t]he prosecution is entitled to present evidence showing the cause of death, even if the cause is uncontested, to give the jury an 'appreciation of the nature and circumstances of the crimes.'" *State v. Catron*, 8th Dist. Cuyahoga No. 101789, 2015-Ohio-2697, ¶ 25, quoting *State v. Chatmon*, 8th Dist. Cuyahoga No. 99508, 2013-Ohio-5245, ¶ 41. Moreover, the state has latitude in constructing its case and determining the manner by which it meets its burden of proof. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d

1051, ¶ 99, 103 ("[T]he state bears the burden of proof and it has no obligation to meet that burden in the least gruesome way.") (Emphasis sic.); *see also State v. Kirkland*, [160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 101], quoting *State v. Maurer*, 15 Ohio St.3d 239, 265, 15 Ohio B. 379, 473 N.E.2d 768 (1984) ("'[T]he mere fact that a photograph is gruesome or horrendous is not sufficient to render it per se inadmissible.'").

*State v. Johnson*, 8th Dist. Cuyahoga No. 109041, 2020-Ohio-5255, ¶ 95.

{¶ 56} A review of the exhibits illustrates that some of the photographs appear to have been unnecessary, particularly in light of the medical examiner's report documenting the injuries. Notwithstanding that fact, the case was tried to the bench. Under Ohio law, in a bench trial, "the trial court is entitled to the presumption of regularity, that is, the trial court is presumed to know and follow the law in arriving at its judgment unless it affirmatively appears to the contrary." *State v. Shropshire*, 8th Dist. Cuyahoga No. 103808, 2016-Ohio-7224, ¶ 37, citing *State v. Eley*, 77 Ohio St.3d 174, 180, 672 N.E.2d 640 (1996), citing *State v. Post*, 32 Ohio St.3d 380, 513 N.E.2d 754 (1987). "In other words, in an appeal from a bench trial, we presume that a trial court relies only on relevant, material, and competent evidence in arriving at its judgment." *Id.*, citing *id.* at 180.

{¶ 57} The third assignment of error is overruled.

## C. Denial of new counsel

{¶ 58} Maxey claims the trial court abused its discretion when it denied Maxey's oral motion to have new counsel appointed. This court disagrees.

{¶ 59} A trial court has broad discretion in determining whether to remove court-appointed counsel. *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014-

Ohio-1621, ¶ 19. An appellate court reviews the trial court's decision to determine whether that discretion has been abused. *Id.* An "abuse of discretion" implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 60} Indigent criminal defendants have a Sixth Amendment right to have counsel appointed by the court. *State v. Ingram*, 8th Dist. Cuyahoga No. 84925, 2005-Ohio-1967, ¶ 20, citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). That right "does not, however, guarantee that defendants will have their 'counsel of choice.'" *Id.*

{¶ 61} An indigent defendant is required to demonstrate that the relationship with counsel "has broken down to such a degree as to jeopardize [the] right to effective assistance of counsel." (Citations omitted.) *State v. Badran*, 8th Dist. Cuyahoga No. 90725, 2008-Ohio-6649, ¶ 8. The trial court is required to inquire into the indigent defendant's complaint regarding the assigned counsel and to "make the inquiry part of the record." (Citations omitted.) *Id.* "The inquiry need only be brief and minimal." *State v. Lozada*, 8th Dist. Cuyahoga No. 94902, 2011-Ohio-823, ¶ 29, citing *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 139.

{¶ 62} At the June 13, 2023 final pretrial, defense counsel reminded the trial court that it had previously appointed an expert and had granted a continuance to allow the defense to confirm the authenticity of the security video. Defense counsel

was advised by the expert just prior to the pretrial that there was no issue with the video. Counsel expounded:

Counsel: In the process of representing Mr. Maxey, [defense counsel] and I, we may have lost his confidence. He thinks that he's entitled to something called an evidentiary hearing.

I don't know if he's been reading something while he's in the jail there. We have tried to reassure him that there are no issues that would require an evidentiary hearing. There's no motions to suppress in this case.

The video is crucial to the case. We found and we have been told by an expert that that has been authenticated.

We are prepared to go to trial, Your Honor, tomorrow. However, my client does have some reservations I think that he would like to address with the Court.

Also we wanted the Court to explain to him, because maybe he's not trusting us, that there's no basis for any type of evidentiary hearing that can be had. We are set to go to trial in the morning, Your Honor.

Tr. 13-15.

{¶ 63} The trial court commented that the case had been continued several times and asked Maxey about his concerns:

Maxey: The counsel –

Court: By the way, you have two of the best appointed. Not everybody is qualified for murder, okay? So you need to know that. They are on a specialized list with the county and the state to be able to do these cases.

Maxey: I feel like counsel has been like inconsistent and ineffective. It's just – because I have no confidence.

Court: Okay.

Maxey: I don't believe they're confident in what they have been doing.

Court: Because they don't agree with your position?

Maxey: Some –

Tr. 15-16.

{¶ 64} The trial court explained:

You know, the work of your defense counsel is to explore the discovery at every end, to make sure that the case is set forward, that your constitutional rights are protected, the evidentiary rulings are protected during the course of the trial.

You are not trained in that process and, frankly, these are, you know, next to the most-serious charges that you can have and you are looking at 20, 25, 30 to life or life without parole if you are found guilty in Counts 1 or 2.

You're looking at in Counts 3, 4 and 5, if you are found guilty of the murder, 15 to life on each of those counts.

Then felonious assault is two to eight years and aggravated robbery is three to ten years with some details to be known about that, but the discovery is complete in this case, is it not, Counsel?

Tr. 16. Counsel responded that discovery was complete.

{¶ 65} The trial court continued:

Court: All right. Very good. So, Mr. Maxey, at quarter to 5:00 the day before trial, where I have already granted continuances requested by you, and I think maybe one by the State because they were engaged, to be able to do full discovery in this matter, my plan is to proceed tomorrow.

Maxey: They just haven't been –

Court: Well, they're not agreeing with what you – well, they're not agreeing with what you think should be happening, but that's not their job. Their job is to defend you to the utmost at your trial.

Maxey: – suspect like deception and all type of things, so it's like –

Court: Well, what deception is there?

Maxey: Just like exigencies and stuff.

Court:  Like what?

Maxey:  You know, conversations that I have had, just not consistent. Like they sending the evidence out and I have no paperwork showing anything. They can just tell me anything, you know, like.  * * * No paperwork showing anything, that they have examined any evidence. So they haven't shown me anything.

Tr. 17-18.

{¶ 66} Addressing Maxey's reference to concerns regarding the expert report, counsel responded, "[W]e made recommendations to Mr. Maxey.  Mr. Maxey has always been concerned about the video evidence in this case." Tr. 19.  Maxey asked counsel where the paperwork was for the expert report.  Counsel advised him the expert was retained for consultation only due to concerns the video would not be helpful for Maxey.  Maxey insisted, so counsel allowed Maxey to speak directly with the expert regarding the conclusions and why a report was not generated.

Counsel:  Maxey began cross-examining the expert, at which point I said: Don't worry about that, I understand where you're at with things.

Then we get into the evidentiary hearing again part of this. He seems to believe that the Court is required to give him an evidentiary hearing, a motion to suppress and other things he's identified, and I can discuss this, because it doesn't go into the confidence –

Court:  Legally there's no issue there.

Tr. 20.

{¶ 67} The parties discussed showing Maxey the videos again, a summary of the video contents, and the trial court acknowledged that identification would be an issue for the factfinder.

Maxey:  There's other issues, like the proof that the detectives on the case –

Court:  Well, you're going to be able to cross –

Maxey:  – and the investigation and stuff like that.

* * *

Maxey:  I feel – personally I feel that there's grounds for an evidentiary hearing. Without that I don't feel that my counsel –

Court:  An evidentiary hearing on what? The evidence will be presented at trial for the jury. So that will be what happens.

Maxey: I mean like it should be addressed outside of a trial.

Court:  Well, we are doing it right now. That's why we are here. There are no issues.

Maxey:  Outside of trial.

Court:  Yes, but there are no issues with the evidence to this point.

Tr. 21-22.

{¶ 68} Maxey maintained his position regarding an evidentiary hearing and lack of confidence in appointed counsel.  The trial court stated, "[O]n the eve of trial and the time that's gone by here, other than what you placed on the record, I will expect he will be dressed tomorrow." Tr. 23.  The trial court adjourned but allowed defense counsel to use the courtroom to show Maxey the video again.

{¶ 69} The trial court conducted an in-depth inquiry into Maxey's concerns despite the requirement that the inquiry need only be brief.  The concerns were made part of the record.  Maxey did not meet his "burden of demonstrating proper grounds for the appointment of new counsel." *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014-Ohio-1621, ¶ 18. He did not demonstrate "'a breakdown in the attorney-client relationship of such magnitude as to jeopardize a

defendant's right to effective assistance of counsel.'" *State v. Coleman*, 37 Ohio St.3d 286, 292, 525 N.E.2d 792 (1988), quoting *People v. Robles*, 2 Cal.3d 205, 215, 85 Cal. Rptr. 166, 466 P.2d 710 (1970).

{¶ 70} The trial court did not abuse its discretion.

{¶ 71} The fourth assigned error is overruled.

## IV. Conclusion

{¶ 72} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

EILEEN A. GALLAGHER, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR